**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-4755**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

KEVIN GARCIA FUERTES, a/k/a Kerlin Esquivel-Fuentes, a/k/a Flaco,

Defendant – Appellant.

---

**No. 13-4931**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

GERMAN DE JESUS VENTURA, a/k/a Chino, a/k/a Chalo, a/k/a Pancho, a/k/a Chaco, a/k/a Oscar,

Defendant – Appellant.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore. William D. Quarles, Jr., District Judge. (1:10-cr-00770-WDQ-2; 1:10-cr-00770-WDQ-1)

---

Argued: May 13, 2015                    Decided: August 18, 2015

---

Before KING and KEENAN, Circuit Judges, and DAVIS, Senior Circuit Judge.

———————————

No. 13-4755 affirmed; No. 13-4931 affirmed in part and vacated and remanded in part by published opinion. Senior Judge Davis wrote the opinion, in which Judge King and Judge Keenan joined.

———————————

**ARGUED:** Nicholas J. Vitek, VITEK LAW LLC, Baltimore, Maryland; Michael Daniel Montemarano, MICHAEL D. MONTEMARANO, P.A., Columbia, Maryland, for Appellants. Sujit Raman, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, P. Michael Cunningham, Rachel M. Yasser, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————————

DAVIS, Senior Circuit Judge:

These appeals arise from the prosecution of two members of an enterprise engaged in interstate prostitution. Following a two-week trial, a jury convicted Appellants Kevin Garcia Fuertes ("Fuertes") and German de Jesus Ventura ("Ventura") of conspiracy to commit, and commission of, a number of sex trafficking and related offenses. On appeal, Fuertes and Ventura make four assertions of error, two individually and two jointly, regarding evidentiary rulings, jury instructions, and the sufficiency of the evidence. For the reasons stated below, we affirm the Fuertes judgment in No. 13-4755. In Ventura's appeal, No. 13-4931, applying plain error review, we conclude that the conviction under 18 U.S.C. § 924(c) for possession and use of a firearm in relation to a crime of violence was erroneous because, we hold, sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a), is not categorically a crime of violence. Accordingly, we vacate the conviction on Count Seven and remand for entry of judgment of acquittal on that count but we otherwise affirm the Ventura judgment.

I.

A.

The trial evidence was amply sufficient to permit the jury to find the following facts.

By early 2008, Ventura was operating brothels in the Hispanic community in Annapolis, Maryland. Fuertes helped Ventura run the brothels, as well as advertise the prostitution business. To maintain control over the sex trade, Fuertes and Ventura threatened perceived competitors with violence. For example, in March 2008, Ventura told Alberto Hernandez Campos ("Campos") about trouble he was having with another Annapolis-area pimp, Ricardo Humberto "el Pelon" Rivas Ramirez ("Ramirez"). Then, to emphasize the seriousness of the matter, Fuertes showed Campos a handgun.[1]

Following this encounter, on September 13, 2008, Ramirez was murdered. Investigators learned that Ramirez had received threatening phone calls from two different phone numbers (one phone number ending in 5015, the other in 1397) some time prior to his murder. Police sought subscriber information for the two phone numbers, and entered them into a database for future investigative purposes.

On September 24, 2008, Fuertes was arrested following an unrelated traffic violation. When he provided booking information, Fuertes gave a phone number that matched the 5015

---

[1] Ventura's operation also adversely affected individuals who happened simply to live in close proximity to the brothels. One family began receiving threatening phone calls and had their home and car vandalized after offering assistance to one of Ventura's prostitutes.

number from which Ramirez had received threatening phone calls. Fuertes was arrested again the next day, this time on an open warrant. At the time of this arrest, Fuertes had in his possession a cellular phone with the 5015 number, as well as business cards advertising prostitution services.

After his September 25 arrest, Fuertes consented to a search of his home in Annapolis, where officers found evidence that the residence was being used as a brothel. In the living room, investigators found a cellular phone, which an occupant of the house permitted them to examine. The contacts list contained the 1397 number from which Ramirez had received threatening calls. Police also located a physical address book, which listed two phone numbers for "Pancho": the 1397 number, as well as another number ending in 0903. After obtaining a warrant, police learned that Ventura was listed as the subscriber for the phone number ending in 0903. Witnesses in the investigation eventually identified Ventura by the aliases/nicknames of "Pancho" and "Chino," among others.

Suspecting that Ventura and Fuertes were responsible for Ramirez's murder, investigators continued to monitor their activities. Agents learned that Ventura operated brothels at several locations in Annapolis, as well as in Easton, Maryland and Portsmouth, Virginia. Ventura arranged for prostitutes to work in the brothels from Monday through Sunday. Typically, the

women communicated with Ventura by phone, then traveled by bus to Washington, D.C., where they met Ventura, or one of his employees, and drove to the brothel where they worked for the week. The prostitutes provided fifteen minutes of sex for thirty dollars, and were paid half of the gross receipts, less expenses for food, hygiene products, and other expenses of the trade. One woman, Margarita Santiago Laona, testified that she spoke with Ventura by telephone while she was in New Jersey, and then traveled by bus to Washington, D.C., where he met her and took her to a nearby brothel.

Rebeca Duenas Franco ("Duenas"), another woman employed by Ventura, had a particularly violent history with him. On the one hand, he helped extricate her from the control of another pimp. He also had a relationship with Duenas—indeed, she believes he is the father of her son—and provided her with a place to live. On the other hand, Ventura compelled Duenas to engage in prostitution by violence and threats of violence, and held her against her will. Ventura reintroduced Duenas to prostitution by giving her a box of condoms, telling her to "go to work," and beating her "several times" when she resisted. J.A. 1186. On one occasion, when Duenas refused to have sex with an African-American client, Ventura beat her with a belt. On another occasion, when Duenas refused to perform a sex act

6

with an object, Ventura pushed her down onto rocky ground.[2] Ventura also discharged a gun in her presence. Unlike other women working for Ventura, Duenas did not receive any money from her services as a prostitute.

At trial, Duenas testified that Ventura threatened competitor pimps, including Ramirez, and that she witnessed Ventura and Fuertes celebrating Ramirez's murder. Duenas also recounted an incident when Ventura assaulted a male employee who threatened to go to the police. During another incident, Ventura beat a prostitute who he believed had sent people to rob one of his brothels. According to Duenas, Fuertes was present when Ventura beat the prostitute, as well as at least one occasion when Ventura beat her.[3]

On March 25, 2009, police again arrested Fuertes at an apartment in Annapolis, and found evidence that the residence was being used as a brothel. During a protective sweep, police found Duenas and another woman hiding in a bedroom closet.

---

[2] During the trial, Dr. Mary-Theresa Baker, a physician of twenty-five years and then-director of the Baltimore Child Abuse Center, testified about her forensic medical examination of Duenas. Dr. Baker testified that Duenas' explanations as to how she received certain injuries were generally consistent with her own observations during the examination.

[3] On direct examination, Duenas indicated that Fuertes was at the house when Ventura beat her with a belt. But, on redirect, she clarified that Fuertes had in fact witnessed the beating.

7

Meanwhile, a search of Fuertes revealed $696 in cash, a wallet with miscellaneous papers, including a piece of paper listing the 0903 phone number associated with Ventura, and a cellphone. Following his 2009 arrest, Fuertes relocated to Virginia because he had been entered into deportation proceedings by the Department of Homeland Security.

On September 24, 2009, police arrested Ventura in Annapolis on an open warrant from the District of Columbia. A search of Ventura revealed $859 in cash and documents detailing how many customers each prostitute had serviced in the past week. Ventura also had his Maryland driver's license, a Mexican license that featured his picture but a different name, and two cell phones. Despite having two cell phones on his person, Ventura told the police that he did not have a phone number. He claimed that he had found one cell phone at the mall, and that he was borrowing the other from a taxicab driver whose name he did not know. A later search revealed that one of the phones had the 0903 number.

Months later, on February 17, 2010, Annapolis police responded to a 911 call for a possible robbery. The call came from a phone number which, police eventually learned, was the number Ventura used after his 2009 arrest. The police located the site of the robbery, which turned out to be another brothel operated by Ventura. Maximilliano Zelaya Repalo, a former

8

employee of Ventura, testified at trial that he committed the robbery because he had not been paid for his work at the brothel.

In May 2010, police discovered that Ventura was operating another brothel in Easton. On July 7, 2010, they executed a search warrant at the brothel and arrested two individuals who were working there. Law enforcement continued its investigation, and on August 2, 2010, learned that Ventura was transporting a prostitute from Maryland to a brothel in Portsmouth.

Back in Annapolis, on November 3, 2010, several men believed to be operating at Ventura's behest seriously assaulted competitor-pimp Hector Fabian Avila. Law enforcement, therefore, decided to bring its investigation to a close, and on November 15, 2010, arrested Ventura in his home. Fuertes was also charged but was not arrested at that time.

B.

On November 29, 2011, a federal grand jury returned a superseding indictment, charging Fuertes and Ventura with conspiracy to transport an individual in interstate commerce for the purpose of prostitution, in violation of 18 U.S.C. § 371 (Count One); transportation of individuals in interstate commerce for the purpose of prostitution, in violation of 18 U.S.C. § 2421 (Count Two); and sex trafficking by force, fraud,

9

or coercion, in violation of 18 U.S.C. § 1591(a) (Count Six). Ventura was also separately charged with coercing or enticing an individual to travel in interstate commerce for the purpose of prostitution, in violation of 18 U.S.C. § 2422(a) (Count Three); transportation of individuals in interstate commerce for the purpose of prostitution, in violation of 18 U.S.C. § 2421 (Counts Four and Five); and possession and use of a firearm in relation to a crime of violence—namely, sex trafficking by force, fraud, or coercion—in violation of 18 U.S.C. § 924(c) (Count Seven).

After the district court denied most of their pretrial motions, Fuertes and Ventura proceeded to trial. The jury found Ventura guilty of all counts and Fuertes guilty of Count One and that part of Count Six based on events occurring subsequent to December 24, 2008. It found Fuertes not guilty of Count Two. The district court denied Fuertes and Ventura's post-trial motions for judgment of acquittal or a new trial, and sentenced Ventura to 420 months' imprisonment and Fuertes to 235 months' imprisonment. These timely appeals followed.

## II.

### A.

Fuertes and Ventura contend that the district court erred in admitting evidence of violent acts and threats of violence against competitor pimps because: (1) such evidence was offered

10

for no purpose other than to establish their bad character; (2) the evidence was not relevant, as it did not make it more likely that they actually committed the sex trafficking offenses for which they were charged; and (3) even if the evidence was relevant, its probative value was far outweighed by the danger of unfair prejudice. We disagree.

Rule 404(b) of the Federal Rules of Evidence "prohibits evidence of 'other crimes, wrongs, or acts' solely to prove a defendant's bad character, but '[s]uch evidence . . . may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" United States v. Byers, 649 F.3d 197, 206 (4th Cir. 2011) (quoting United States v. Basham, 561 F.3d 302, 326 (4th Cir. 2009)). The rule is "inclusive," "admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." United States v. Young, 248 F.3d 260, 271–72 (4th Cir. 2001) (internal quotation marks omitted). To be admissible under Rule 404(b), the proffered "bad acts" evidence must be "relevant to an issue other than character," "necessary to prove an element of the crime charged," "reliable," and its "probative value must not be substantially outweighed by its prejudicial nature." United States v. Rooks, 596 F.3d 204, 211 (4th Cir. 2010) (quoting United States v. Queen, 132 F.3d 991, 995 (4th Cir. 1997)). The

11

district court's decision to admit the evidence is reviewed for abuse of discretion.  United States v. Forrest, 429 F.3d 73, 79 (4th Cir. 2005).

Applying the above standard, the district court did not abuse its discretion in admitting evidence of violent acts and threats of violence against competitor pimps.  The evidence was relevant to Fuertes and Ventura's familiarity with the prostitution business, as well as their intent to participate in that business.  In other words, Fuertes and Ventura's attempts to intimidate or eliminate others involved in the sex trafficking business constituted evidence of their own participation in that very business, and that they knowingly conspired with each other to do so.  Likewise, evidence that Ventura intimidated a family that had attempted to help a prostitute tended to establish Ventura's connection to the prostitute, the brothel at which she worked, the prostitution business generally, and the underlying conspiracy out of which the business thrived.

Central to Appellants' assertion of error is their argument that evidence of their violent acts and threats was "unnecessary" to prove any element of the Count One conspiracy charge.  This argument is misplaced.  As explained by the district court, to find Fuertes and Ventura guilty of conspiracy, the jury had to find at least one overt act was

12

committed in furtherance of the charged conspiracy.  And among the overt acts charged in the superseding indictment were violent acts and threats of violence against competitors.  In particular, Count One alleged that, as part of the conspiracy, Fuertes and Ventura "threatened to use and used violence against those also engaged in prostitution activities within Maryland." J.A. 38–39.  Count One further alleged that, as part of the conspiracy, Ventura "claimed responsibility for the murder of multiple competitor pimps in order to intimidate competitor pimps and his own employees and female prostitutes."  J.A. 39.

Finally, although the above-described evidence of violent acts and threats may have been highly incriminating, Fuertes and Ventura proffer no convincing reason why it was unreliable (and thus lacking in probative force) or unfair.  In light of the substantial evidence that Fuertes and Ventura forced Duenas—a young woman illegally present in the country with no English skills and a third-grade education—into prostitution, there was no "genuine risk" that the jury would be excited to "irrational behavior" over threats of violence and acts of violence against less sympathetic competitor pimps.  United States v. Hodge, 354 F.3d 305, 312 (4th Cir. 2004).  The evidence of threats and acts of violence was no more "sensational or disturbing" than the sex trafficking crimes with which Fuertes and Ventura were charged. See Byers, 649 F.3d at 210 ("Generally speaking, 'bad acts'

13

evidence, admissible under Rule 404, is not barred by Rule 403 where such evidence 'did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged.'" (quoting United States v. Boyd, 53 F.3d 631, 637 (4th Cir. 1995)). Thus, in sum, the district court's decision to admit the evidence of violence and threats of violence against competitor pimps was neither legally erroneous nor an abuse of discretion.[4]

---

[4] In finding no reversible error in the district court's admission of the evidence, we need not delve into the intrinsic/extrinsic inquiry advocated by the government at oral argument. The government asserted during argument that, because violent acts and threats of violence were charged as overt acts in the superseding indictment, they were "intrinsic" to the Count One conspiracy charge and for that reason alone were admissible. When questioned about what, if any, judicially enforceable limitation existed on the government's ability to include overt acts in a proposed indictment, the government pointed to the Grand Jury Clause of the Constitution's Fifth Amendment, while defense counsel pointed to the Due Process Clause of that same amendment. As an overt act in furtherance of a conspiracy under 18 U.S.C. § 371 need not be alleged in an indictment, see United States v. Janati, 374 F.3d 263, 270 (4th Cir. 2004), it would be a strange rule of law that authorized a district court to exclude such evidence upon objection at trial only if it were not included in an indictment and thereby "approved" by the grand jury.
    At all events, the intrinsic/extrinsic inquiry has ventured far from where it began. See Milton Hirsch, "This New-Born Babe an Infant Hercules": The Doctrine of "Inextricably Intertwined" Evidence in Florida's Drug Wars, 25 Nova L. Rev. 279, 280 (2000) ("[U]ntil about the year 1980, no one thought that evidence of uncharged crimes could be rendered admissible by the simple expedient of describing it as 'inextricably intertwined' with evidence of the crime or crimes actually pleaded in the indictment."). As pointed out by the D.C. Circuit, "it cannot be that all evidence tending to prove the crime is part of the
(Continued)

14

B.

Fuertes and Ventura argue that the district court erred in permitting Dr. Baker to testify because: (1) her training and experience were almost entirely with juveniles; and (2) she did not provide an expert opinion but instead simply attempted to bolster Duenas' credibility concerning the source of the latter's injuries. They are incorrect.

Rule 702 of the Federal Rules of Evidence provides that "[a] witness who is qualified as an expert by knowledge, skill,

---

crime. If that were so, Rule 404(b) would be a nullity." United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000). Yet, by characterizing evidence as "intrinsic," federal courts, including this one, have allowed prosecutors to introduce evidence of uncharged bad acts free from Rule 404(b)'s protections, including limiting jury instructions and advanced notice of the government's intent to introduce the evidence. Fortunately, some courts have begun to recognize the harm caused by granting federal prosecutors such unmitigated leeway. See United States v. Gorman, 613 F.3d 711, 719 (7th Cir. 2010) (abandoning the "inextricable intertwinement doctrine" because it "has outlived its usefulness" and "become overused, vague, and quite unhelpful"); United States v. Green, 617 F.3d 233, 248 (3d Cir. 2010) ("[T]he inextricably intertwined test is vague, overbroad, and prone to abuse, and we cannot ignore the danger it poses to the vitality of Rule 404(b)."); Bowie, 232 F.3d at 927 ("[I]t is hard to see what function this [intrinsic/extrinsic] interpretation of Rule 404(b) performs."); see also United States v. Irving, 665 F.3d 1184, 1215 (10th Cir. 2011) (Hartz, J., concurring) (stating that "the intrinsic/extrinsic dichotomy serves no useful function and consumes unnecessary attorney and judicial time and effort," and that "the distinction between intrinsic and extrinsic evidence is unclear and confusing, and can lead to substituting conclusions for analysis").

15

experience, training, or education may testify in the form of an opinion or otherwise if":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Where, as here, the expert testimony is of a scientific nature, the district court serves, in essence, as gatekeeper, admitting the testimony where it "'is not only relevant, but reliable.'" United States v. Crisp, 324 F.3d 261, 265 (4th Cir. 2003) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)).

The district court must exclude "expert testimony related to matters which are obviously . . . within the common knowledge of jurors." United States v. Lespier, 725 F.3d 437, 449 (4th Cir. 2013) (internal quotation marks omitted). Thus, absent "unusual circumstances," the district court must exclude expert testimony on issues of witness credibility. Id. The district court's decision to admit expert testimony is reviewed for abuse of discretion. See United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010).

16

Applying the above standard, the district court did not abuse its discretion in permitting Dr. Baker, who had ample knowledge, skill, experience, training, and education with regard to cutaneous findings of abuse, to testify as an expert. A physician for twenty-five years, Dr. Baker served as the director of the Baltimore Child Abuse Center, where she performed complete medical examinations and collected forensic evidence for alleged cases of child abuse in Baltimore City. Dr. Baker explained that, during a forensic examination, she focuses particularly on cutaneous findings (the most common type of child abuse findings), and that when she discovers an injury to the skin, she can draw certain conclusions about the possible source or cause of the injury. Dr. Baker further testified that she had examined more than 3,000 individuals where there was a concern of possible past injury, and trained pediatric residents, nurse examiners, and staff doctors on how to perform forensic examinations. Finally, Dr. Baker testified that she had been qualified to testify as an expert in over two dozen cases, including cases in the District of Maryland.

Fuertes and Ventura take issue with the fact that Dr. Baker's "experience was almost entirely with juveniles," and that her "training and experience were not in the formation and treatment of adult scars." Defs.' Br. at 47. But, as explained by Dr. Baker, "[o]ther than the extreme," such as "very old

17

people [who] have fragile skin" and "very young children [who] are particularly prone [to] . . . things that can be mistaken for abuse," there is no distinction between adults and children when it comes to cutaneous findings. J.A. 1388. In any event, Fuertes and Ventura's objection to Dr. Baker's training and experience goes to the weight, not the admissibility, of her testimony, and counsel had the opportunity to cross-examine her on these issues. See Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993) ("The witness' qualifications to render an expert opinion are [] liberally judged by Rule 702."). Likewise, Fuertes and Ventura's critique that Dr. Baker could not testify about when Duenas sustained her injuries was appropriate fodder for cross-examination. The fact that Dr. Baker could not reach a conclusion as to when Duenas was injured did not render the rest of her testimony unhelpful or inadmissible.

Turning to Fuertes and Ventura's argument that Dr. Baker merely provided an opinion as to whether Duenas was telling the truth, this argument must be rejected. Dr. Baker neither opined on Duenas' credibility, nor offered an opinion as to who caused her injuries. Cf. Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1054–56 (4th Cir. 1986) (determining that the district court erred in admitting expert testimony on "human factors"). Rather, Dr. Baker's testimony was offered to assist the jury in determining whether there were signs and markings that Duenas

18

had been physically injured. While Dr. Baker's testimony tended to corroborate Duenas' account of how she sustained her injuries (i.e., being hit with a belt or being pushed down onto rocky ground), the mere fact that expert testimony tends to corroborate the testimony of another witness is not grounds for exclusion; indeed, it is surely the case that most expert opinion evidence proffered by litigants is paired with lay evidence that is in some fashion supported by the expert opinion. E.g., United States v. Gonzales-Flores, 701 F.3d 112, 115 (4th Cir. 2012) (testimony of confidential informant in drug trafficking prosecution corroborated by forensic expert); Barbe v. McBride, 521 F.3d 443, 461 (4th Cir. 2008) ("[T]he prosecution utilized its expert evidence to corroborate J.M.'s trial testimony and thus buttress the allegation that Barbe had indeed sexually abused her."). Thus, the district court's decision to admit Dr. Baker's expert opinion testimony was neither erroneous nor an abuse of discretion.

## C.

Ventura asserts that the district court erred in denying his motion for judgment of acquittal with respect to Count Seven, possession and use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). He claims that sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a), which served as the predicate offense for his

19

§ 924(c) conviction, is not categorically a crime of violence. We agree.

### 1.

As a preliminary matter, we must determine which standard of review applies. Ventura asserts that de novo review is appropriate in light of his general Rule 29 motion for judgment of acquittal. See United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010) (stating that the court reviews de novo the district court's denial of a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure). He argues that a "broadly stated" motion for judgment of acquittal is "sufficient to preserve the full range of challenges, whether stated or unstated, to the sufficiency of the evidence." United States v. Hammoude, 51 F.3d 288, 291 (D.C. Cir. 1995). And, here, because sex trafficking by force, fraud, or coercion can never satisfy § 924(c)(3)'s definition of a crime of violence, there is insufficient evidence to support his conviction on Count Seven.

The government, however, points out, correctly we think, that Ventura's objection is not about factual or evidentiary sufficiency; rather, his argument is a purely legal one. As explained by the government, Ventura takes issue with the district court's instruction to the jury regarding Count Seven— in particular, its instruction that sex trafficking by force,

20

fraud, or coercion is categorically a crime of violence. And, because Ventura neither objected to the instruction nor argued that Count Seven is not categorically a crime of violence, his claim may be reviewed only for plain error. See, e.g., United States v. Tillery, 702 F.3d 170, 175 (4th Cir. 2012) ("Because [the defendant] did not object to the jury instructions at trial, we review the instructions for plain error.").

The government's analysis is the correct one. Ventura's motion for judgment of acquittal, which dealt only with the sufficiency of the evidence, did not preserve a purely legal challenge to the jury instruction regarding Count Seven. Accordingly, to prevail on appeal, Ventura must show: (1) there was an error; (2) the error was "clear or obvious, rather than subject to reasonable dispute;" (3) "the error affected [his] substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings;" and (4) "the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." United States v. Marcus, 560 U.S. 258, 262 (2010) (internal quotation marks omitted).

2.

To sustain a conviction under 18 U.S.C. § 924(c), the government must prove that the defendant (1) used or carried a firearm and (2) did so during and in relation to a "crime of violence." Section 924(c)(3) defines a "crime of violence" as

21

"an offense that is a felony and—(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3). Section 924(c)(3)(A) is referred to as the "force clause," while section 924(c)(3)(B) is called the "residual clause."

In determining whether an offense qualifies as a "crime of violence" under either clause, the court may (depending on the features of the applicable statute) employ the "categorical approach" or the "modified categorical approach." "[T]he modified approach serves a limited function: It helps effectuate the categorical analysis when a divisible statute, listing potential offense elements in the alternative, renders opaque which element played a part in the defendant's conviction." Descamps v. United States, 133 S. Ct. 2276, 2283 (2013). The categorical approach, by contrast, applies when the defendant was convicted of an offense under "an 'indivisible' statute—i.e., one not containing alternative elements." Id. at 2281.

A statute is indivisible when "the jury need not agree on anything past the fact that the statute was violated." Rendon v. Holder, 764 F.3d 1077, 1085 (9th Cir. 2014). "Any statutory phrase that—explicitly or implicitly—refers to multiple,

22

alternative means of commission must still be regarded as indivisible if the jurors need not agree on which method of committing the offense the defendant used." Id. Thus, "mere use of the disjunctive 'or' in the definition of a crime does not automatically render it divisible." Omargharib v. Holder, 775 F.3d 192, 194 (4th Cir. 2014). "Only when [the] law requires that in order to convict the defendant the jury must unanimously agree that he committed a particular substantive offense contained within the disjunctively worded statute are we able to conclude that the statute contains alternative elements and not alternative means." Rendon, 764 F.3d at 1086 (emphasis in original). Accordingly, although § 1591(a) refers to alternative means of commission, it contains a single, indivisible set of elements, and the categorical approach applies.

Under the "categorical approach," the court "look[s] only to the fact of conviction and the statutory definition of the [] offense." James v. United States, 550 U.S. 192, 202 (2007) (internal quotation marks omitted), overruled on other grounds, Johnson v. United States, 135 S. Ct. 2251 (2015). The court does not consider the "particular facts disclosed by the record of conviction." Id. (internal quotation marks omitted). "The point of the categorical inquiry is not to determine whether the defendant's conduct could support a conviction for a crime of

23

violence, but to determine whether the defendant was <u>in fact</u> <u>convicted</u> of a crime that qualifies as a crime of violence." <u>United States v. Cabrera-Umanzor</u>, 728 F.3d 347, 350 (4th Cir. 2013) (emphasis in original).

Applying the above test, we consider first whether sex trafficking by force, fraud, or coercion qualifies categorically as a crime of violence under the force clause, § 924(c)(3)(A). It does not. After <u>Descamps</u>, when a statute defines an offense using a single, indivisible set of elements that allows for both violent and nonviolent means of commission, the offense is not a categorical crime of violence. <u>Cf.</u> <u>United States v. Aparicio-Soria</u>, 740 F.3d 152, 157–58 (4th Cir. 2014) (en banc) (reasoning that, because the Maryland offense of resisting arrest has a single and indivisible set of elements that may be committed by either violent or nonviolent means, it does not qualify categorically as a crime of violence under U.S.S.G. § 2L1.2, the reentry Guideline); <u>United States v. Royal</u>, 731 F.3d 333, 341–42 (4th Cir. 2013) (reasoning that, because the Maryland offense of second-degree assault has an indivisible set of elements that may be committed by either violent or nonviolent means, it does not qualify categorically as a "violent felony" under § 924(e)(1)). Accordingly, because § 1591(a) specifies that sex trafficking by force, fraud, or coercion may be committed nonviolently—i.e., through fraudulent means—the offense does not

24

qualify as a categorical crime of violence under the force clause.

Turning to the residual clause, the government suggests that sex trafficking is categorically a crime of violence under § 924(c)(3)(B) because, even where the defendant effects the offense by means of fraud, there is still a substantial risk of physical injury from the prostitute's customers, or johns.[5] This argument misapprehends the clear language of the residual clause, which specifies that a felony is a crime of violence when it, "by its nature, involves a substantial risk that physical force against the person or property of another <u>may be used in the course of committing the offense</u>." 18 U.S.C. § 924(c)(3)(B) (emphasis added). The residual clause makes plain

_____

[5] We have considered the parties' supplemental briefing following the Supreme Court's decision in <u>Johnson v. United States</u>, 135 S. Ct. 2251 (2015). We note that in <u>Johnson</u>, <u>id.</u> at 2557-60, the Supreme Court held unconstitutionally vague the version of the residual clause set forth in 18 U.S.C. § 924(e)(2)(B), but the Court had no occasion to review the version of the residual clause set forth at 18 U.S.C. § 924(c)(3)(B), the one at issue in this case. The two formulations, one requiring "conduct that presents a serious potential risk of physical injury to another," § 924(e)(2)(B), the other requiring proof of "a felony . . . that by its nature involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," § 924(c)(3)(B), are similarly worded but not identically so. For the reasons explained in text, we find it unnecessary in this case to explore whether the Supreme Court's invalidation of the former provision applies as well to the latter provision. See <u>Ashwander v. Tenn. Valley Auth.</u>, 297 U.S. 288, 346–48 (1936) (setting forth the principle of constitutional avoidance).

25

(for all its erstwhile murkiness) that the relevant inquiry is not whether there is a risk of <u>any</u> person using force in any way tangentially related to an on-going offense, but rather whether there is a substantial risk of the <u>defendant</u> doing so.

The government nevertheless relies on <u>United States v. Willoughby</u>, 742 F.3d 229 (6th Cir. 2014), to argue that the risk of force need not come from the defendant. In <u>Willoughby</u>, the Sixth Circuit observed that:

> the act of causing a minor to engage in prostitution—even when the defendant's act does itself not involve force—obviously does present a "serious potential risk of physical injury" to the victim. U.S.S.G. § 4B1.2(a)(2). There is the risk of physical injury from the sex act itself; the risk of violence from johns, many of whom . . . are addicted to drugs; and, not least, the risk of violence from the pimps themselves.

<u>Id.</u> at 242. But, unlike the present case, <u>Willoughby</u> involved the more expansive definition of a crime of violence found in U.S.S.G. § 4B1.2. <u>See</u> <u>id.</u> (explaining that, under U.S.S.G. § 4B1.2, a "crime of violence" includes "any felony that has as an element the use, attempted use, or threatened use of physical force against the person of another or is burglary of a dwelling, arson, or extortion, involves use of explosives, or <u>otherwise involves conduct that presents a serious potential risk of physical injury to another</u>" (emphasis added) (internal quotation marks omitted)).

26

In analyzing identical language to that contained in §
924(c)(3)(B), the Supreme Court has indicated that the relevant
inquiry in determining whether an offense qualifies as a crime
of violence is not simply whether there is a substantial risk of
physical injury. See Leocal v. Ashcroft, 543 U.S. 1, 10–11 &
n.7 (2004) (deciphering the term "crime of violence" under 18
U.S.C. § 16). Rather, the relevant inquiry is whether there is
a substantial risk that the defendant will use physical force
against the victim in completing the crime. Id.; see also
United States v. Serafin, 562 F.3d 1105, 1110 (10th Cir. 2009)
("[F]or an offense to qualify as a crime of violence under §
924(c)(3)(B), we must ensure the statute proscribes conduct
which not only (1) involves a disregard of a substantial risk of
force against another—which, by itself, would only satisfy the §
4B1.2(a)(2) definition—but also (2) where such risk of force
arises during the course of committing the offense." (emphasis
added)). Thus, for example, "[a] burglary would be covered
under § 16(b) not because the offense can be committed in a
generally reckless way or because someone may be injured, but
because burglary, by its nature, involves a substantial risk
that the burglar will use force against a victim in completing
the crime." Leocal, 543 U.S. at 10 (emphasis added). We
conclude, therefore, that the district court erred in

instructing the jury that sex trafficking by force, fraud, or coercion is categorically a crime of violence.

Having determined that the district court erred, we next consider whether the error was clear or obvious. The government argues that any error could not have been clear or obvious because neither this Court nor the Supreme Court has determined whether sex trafficking qualifies as a crime of violence under § 924(c). Cf. United States v. Wynn, 684 F.3d 473, 480 (4th Cir. 2012) (concluding that, where the court never addressed an issue and the other circuits were split, "the issue has not been resolved plainly" (emphasis in original)). Descamps, however, speaks directly to whether § 1591(a) qualifies categorically as a crime of violence under § 924(c)'s force clause. Moreover, despite the government's argument to the contrary, it is of no import that Descamps was decided after the jury verdict in this case. As the Supreme Court has said, "whether a legal question was settled or unsettled at the time of trial, it is enough that an error be plain at the time of appellate consideration." Henderson v. United States, 133 S. Ct. 1121, 1130 (2013) (internal quotation marks omitted). It is sufficient, in short, that the district court's error as to the force clause is plain on appeal.

Likewise, the district court's error was plain as to the § 924(c)(3)(B) residual clause. As stated above, we reject the

28

government's argument that sex trafficking by force, fraud, or coercion qualifies as a categorical crime of violence under the § 924(c)(3)(B) residual clause because prostitutes face a substantial risk of physical injury from johns.[6]  Given the clear language of the § 924(c)(3)(B) residual clause, and the Supreme Court's analysis in Leocal, the government cannot credibly claim that the district court lacked controlling authority in interpreting § 924(c)(3)(B) and deciding whether sex trafficking by force, fraud, or coercion is categorically a crime of

---

[6] At oral argument, the government did not advance the position that the typical case of sex trafficking by force, fraud, or coercion involves a substantial risk that the defendant will use physical force as a means to commit the offense.  See Oral Argument at 32:42, United States v. Fuertes (No. 13-4755) (counsel referred the court to legislative findings when questioned about why the government did not advance a "typical case" argument).  Following argument, however, the government submitted a letter pursuant to Federal Rule of Appellate Procedure 28(j), contending that, under the Eleventh Circuit's decision in United States v. Keelan, 786 F.3d 865 (11th Cir. 2015), the "ordinary case" of sex trafficking involves a substantial risk that the defendant will use physical force.  Keelan has no bearing on this case.  In Keelan, the Eleventh Circuit confronted whether 18 U.S.C. § 2422, which "prohibits knowingly persuading, inducing, enticing, or coercing a minor to engage in sexual activity," is categorically a crime of violence under 18 U.S.C. § 16(b).  Id. at 870 (emphasis added).  Critical to the court's determination that the offense did so qualify was the fact that the victim was a minor.  See id. at 871 ("We [have] found that [i]n cases involving sex crimes against minors, . . . there is always a substantial risk that physical force will be used to ensure a child's compliance with an adult's sexual demands." (internal quotation marks omitted)).  In any event, we are not persuaded that the ordinary case of sex trafficking by force, fraud, or coercion involves a substantial risk that the defendant will use physical force as a means to commit the offense.

violence under that provision.  Cf. United States v. Carthorne, 726 F.3d 503, 516–17 (4th Cir. 2013), called into question in part by Johnson v. United States, 135 S. Ct. 2251, 2560 (2015).[7]

Finally, we agree with Ventura that the district court's obvious error affected his substantial rights as well as the fairness, integrity, and public reputation of judicial proceedings.  Ventura cannot be guilty of violating § 924(c), and yet he received an additional sixty months' imprisonment for this offense.  "[Five] years of a man's life is not a trifling thing."  United States v. Ford, 88 F.3d 1350, 1356 (4th Cir. 1996).  We simply cannot "require a man to serve [five] undeserved years in prison when [we] know[] that the sentence is improper."  Id.  Accordingly, because the district court plainly erred in instructing the jury that sex trafficking by force, fraud, or coercion is categorically a crime of violence, we vacate Ventura's § 924(c) conviction, and remand for entry of judgment of acquittal on that count and resentencing.

---

[7] Our opinion in United States v. Carthorne, 726 F.3d 503 (4th Cir. 2013), analyzed the career offender guideline, U.S.S.G. § 4B1.2(a).  Id. at 510.  In that guideline, the Sentencing Commission adopted verbatim the residual clause of the Armed Career Criminal Act, which the Supreme Court invalidated as fatally vague under the Fifth Amendment due process clause.  Cf. Johnson, 135 S. Ct. at 2560 (discussing Carthorne).

Fuertes argues that the district court erred in denying his motion for judgment of acquittal on Count Six, as there was insufficient evidence that he knew or recklessly disregarded that Duenas was coerced or forced to engage in commercial sex acts.[8]  We disagree.

As stated above, we review de novo a district court's denial of a motion for judgment of acquittal.  Green, 599 F.3d at 367.  "[A]ppellate reversal on grounds of insufficient evidence . . . will be confined to cases where the prosecution's failure is clear."  Id. (internal quotation marks omitted).  In reviewing the sufficiency of the evidence, the relevant question is whether, viewing the evidence in the light most favorable to the government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. (internal quotation marks omitted).  Put another way, a reviewing court "cannot set aside a jury's verdict if it is supported by substantial evidence when viewed in the light most

---

[8] The district court instructed the jury that Fuertes was guilty of sex trafficking by force, fraud, or coercion if: (1) he knowingly recruited, enticed, harbored, transported, provided, or obtained a person (namely, Duenas) by any means, or benefitted financially from participation in a venture engaged in any such act; (2) he knew or recklessly disregarded that force, fraud, or coercion would be used with respect to Duenas; (3) he knew that Duenas would be engaged in a commercial sex act; and (4) his conduct was in or affecting interstate commerce.

favorable to the government." United States v. Taylor, 659 F.3d 339, 343 (4th Cir. 2011).

Here, a reasonable jury could have found that Fuertes knew or recklessly disregarded that Duenas was forced or coerced to commit commercial sex acts. As pointed out by the government, Fuertes does not dispute "the sufficiency of the evidence of his participation in the commercial sex enterprise with and on behalf of Ventura." Gov't Br. at 43. Nor does he dispute that he was present at most, if not all, of the places where Duenas provided sexual services on behalf of Ventura. Rather, Fuertes disputes that he witnessed one occasion when Ventura beat her with a belt. Although Duenas indicated on direct examination that Fuertes was in the same house (but not necessarily the same room) when Ventura beat her with a belt, she clarified during redirect examination that Fuertes had in fact witnessed the beating. Taking the facts in the light most favorable to the government, a reasonable trier of fact could have found that Fuertes witnessed Ventura beating Duenas, and that the beating, combined with the level of Fuertes' involvement in Ventura's prostitution business, constituted proof beyond a reasonable doubt that Fuertes knew or recklessly disregarded that Duenas was coerced or forced into prostitution. Accordingly, we affirm the district court's denial of Fuertes' motion for judgment of acquittal on Count Six.

III.

For the reasons stated above, the judgment in No. 13-4755 is affirmed; the judgment in No. 13-4931 is affirmed in part and vacated and remanded in part.

No. 13-4755 AFFIRMED;
No. 13-4931 AFFIRMED IN PART AND
VACATED AND REMANDED IN PART WITH INSTRUCTIONS